# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ABEL SALAZAR, | ) |
| Petitioner, | ) ) ) |
| vs. | ) Case No. 14 C 3135 |
| RANDY PFISTER, | ) ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In November 2007, an Illinois jury convicted Abel Salazar of possession of cocaine with intent to distribute and delivery of cocaine, and a judge imposed a prison sentence totaling twenty-five years. The Illinois Appellate Court affirmed Salazar's convictions on direct appeal. After the Illinois Supreme Court denied Salazar's petition for leave to appeal, he filed a petition for post-conviction relief in the Circuit Court of Cook County, which that court denied. The Illinois Appellate Court affirmed the circuit court's decision, and the Illinois Supreme Court denied Salazar's petition for leave to appeal.

Salazar has now petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting eight claims to relief. Respondent Randy Pfister, the warden of the prison where Salazar is incarcerated, argues that the state courts' rulings on five of Salazar's claims were not unreasonable applications of federal law. Pfister contends that the remaining three claims—all of them Fourth Amendment claims—are barred

because Salazar received a full and fair hearing in the state courts. For the following reasons, the Court denies Salazar's petition.

## Background

### A. Trial court proceedings

On August 4, 2006, Abel Salazar, his brother Jose Seka, and Ignacio Ramirez were arrested on the 5300 block of South Fairfield Avenue in Chicago. Nine bricks of cocaine and two bags of cannabis were recovered from Salazar's apartment. The police also recovered 546 grams of cocaine from outside the apartment, which they claimed Seka had dropped. Three weeks later, a grand jury indicted Salazar for possession of cocaine with intent to distribute, delivery of cocaine, and possession of cannabis with intent to deliver. Seka and Ramirez were indicted on similar charges.

Before trial, Salazar filed a motion to quash the arrest and suppress evidence, which Seka and Ramirez joined. In that motion, he challenged the police officers' basis for probable cause—Officer Felix Tomalis's claimed observation of an outdoor drug transaction between Salazar and Seka. He also argued that the officers' warrantless entry into his apartment was not justified by exigent circumstances and that the officers' search of his apartment exceeded the bounds of a protective sweep. Thus, Salazar contended, the evidence recovered from his apartment should be suppressed.

The trial court held a hearing on the motion. At the hearing, Salazar called two of the arresting officers as witnesses, Tomalis and Officer Chris Hackett. Tomalis testified that his team had received information about drug trafficking on the 5300 block of South Fairfield Avenue. In response to this information, he and four other officers set up surveillance of the 5300 block. Shortly after doing so, Tomalis allegedly observed a

2

drug transaction between Salazar and Seka. Specifically, Tomalis testified that he saw Salazar hand Seka a brick-like object wrapped in clear plastic and, in return, Seka hand Salazar money.

After observing this transaction, Tomalis radioed his surveillance team. He then approached Salazar and Seka. According to Tomalis, Salazar ran up the stairs into a residence located at 5321 South Fairfield Avenue. Seka, in turn, dropped the brick-like object and was subsequently detained by Tomalis.

Following Tomalis's testimony, Salazar called Hackett to testify. Hackett testified that he observed Salazar run up the stairs into his apartment shortly after receiving the radio call from Tomalis. He then pursued Salazar into his apartment and, once inside, placed him under arrest.

While placing Salazar under arrest, Hackett said, he heard a noise in the back bedroom of the apartment. He went to investigate, saw Ramirez closing a cooler, and placed Ramirez under arrest. He then returned to the bedroom, opened the cooler, and discovered nine bricks of cocaine. Hackett also recovered a scale, sealer, and baggies from the bedroom, and $604 from Salazar's pocket; another officer recovered two bags of cannabis from somewhere in the apartment.

After hearing this evidence, the trial court issued an oral ruling. The trial court found Tomalis's testimony credible, thereby establishing probable cause. The court also concluded that the warrantless entry into Salazar's apartment was justified by exigent circumstances and the search of the cooler was justified by the need to secure the premises. Accordingly, the trial court denied the motion to quash the arrest and suppress the cocaine recovered from the apartment. Because the officers could not

3

identify where they found the cannabis, however, the trial court suppressed that evidence. Following the suppression hearing, Salazar retained a new attorney, who represented him at trial.

The trial of Salazar and his two codefendants began on November 6, 2007. The prosecution called both of the arresting officers, Tomalis and Hackett, who presented testimony that was similar to their testimony at the suppression hearing. The prosecution also called a forensic scientist, who testified that the brick-like objects tested positive for cocaine, and a fingerprint examiner, who testified that the only suitable fingerprint found on the cooler did not match any of the defendants.

After the prosecution rested, Salazar called Manny Mendoza to testify. Mendoza lived on the third floor of 5319 South Fairfield Avenue, the building where Seka and Ramirez lived (their apartment was on the first floor). Mendoza testified that two police officers knocked on his door around midnight and asked for the whereabouts of Seka and Ramirez. After the officers left, Mendoza reported the encounter to his mother, who lived on the second floor of the building.

Next, Salazar called Maria Mendoza, the mother of Manny Mendoza. She testified that Mendoza woke her around midnight to tell her that two police officers had been looking for Seka and Ramirez. The next morning, she noticed that the lamp on the side of her building was broken, the door to Seka and Ramirez's apartment was open, and their belongings had been scattered, as though their apartment had been searched. She also testified that Salazar had previously lived with Seka and Ramirez but had recently moved to the building next door.

Each of the defendants also testified, and their accounts of the night in question

4

differed dramatically from the officers' accounts. Seka testified first. He denied engaging in a drug transaction with Salazar, claiming that he had stayed in his apartment for the entire evening. According to Seka, the doorbell to his apartment rang around midnight. He was watching the news while Ramirez slept in another room. The person at the door—later revealed to be a police officer—asked for Salazar, and Seka said that Salazar no longer lived in the apartment. The officer then asked for someone named "Canalis." Seka said that he did not know anyone by that name. Following this exchange, Seka said, two officers entered his apartment and placed him under arrest.

Ramirez was called to testify next. He testified that he had gone to bed around 10:30 p.m. and, several hours later, was awakened by a police officer, who was pointing a gun at him. According to Ramirez, he was then handcuffed and taken to the kitchen, where he saw Seka, who was also handcuffed. Ramirez testified that he had never been inside Salazar's apartment and had no knowledge of any drugs there.

Salazar was called to testify last. He testified that he lived at 5321 South Fairfield Avenue—where the nine bricks of cocaine were recovered—and ran a small catering business out of his apartment (which, he explained, was why he owned a scale, sealer, and baggies). On the night in question, he said, he came home around 9 p.m., went to sleep, and, around midnight, awoke to someone kicking down his door. Salazar testified that four or five police officers then entered his apartment and placed him under arrest. After placing him under arrest, the officers went into his back bedroom and, according to Salazar, emerged with a cooler that he had never seen before. Salazar claimed that he had not been in the back bedroom for over a week.

The defense rested after Salazar's testimony. Salazar then renewed his motion

5

to quash the arrest and suppress evidence based on the Mendozas' testimony. The trial court denied the motion, concluding that the Mendozas' testimony was not sufficient to rebut that of the police officers because the Mendozas had not observed the events that transpired outdoors. The jury convicted Salazar of possession of cocaine with intent to deliver and delivery of cocaine.

**B.     Appeal and post-conviction proceedings**

Salazar appealed his convictions on January 29, 2008. He argued that the trial court erred by denying the motion to suppress, failing to sever his trial *sua sponte* based on antagonistic defenses, and mishandling his post-trial, *pro se* claims of ineffective assistance of counsel. He also contended that his pretrial counsel was ineffective for failing to renew the motion to suppress after learning of the Mendozas' favorable testimony (his trial counsel did so after the trial had concluded), failing to move to sever Salazar's trial from that of his codefendants, and arguing in his closing statement that the jury should acquit Salazar because the police lacked probable cause to search his apartment.

The Illinois Appellate Court affirmed Salazar's convictions. The court first addressed the suppression arguments, holding that the trial court did not commit error by finding Officer Tomalis credible. The appellate court also concluded that the warrantless entry into Salazar's apartment was justified by exigent circumstances and that the search of the cooler was justified by the need to secure the premises. Next, the appellate court addressed the trial court's review of Salazar's post-trial, *pro se* claim of ineffective assistance of counsel. The appellate court concluded that this claim lacked merit. Third, the appellate court considered Salazar's ineffective assistance of counsel

claims. On the claim that his pretrial counsel should have renewed the motion to suppress, the appellate court concluded that Salazar could not demonstrate prejudice; the trial court had, in fact, considered a renewed motion (albeit after trial) and had "found that the Mendozas' testimony was not sufficient to rebut the testimony of the police officers . . . ." Resp.'s Ex. A at 15. On the claim that trial counsel should have moved for severance, the appellate court noted that the defendants had "agreed prior to trial that their defenses would not be antagonistic" and that there was "nothing in the record to indicate that the attorneys . . . attacked each other's clients or to indicate that severance was required to ensure a fair trial."[1] *Id.* at 19. Thus, because the defenses were not antagonistic, the appellate court concluded that severance was unnecessary. Lastly, on Salazar's claim that his trial counsel presented a nonviable defense, the appellate court reasoned that trial counsel's discussion of probable cause was intended "to explain why [the] police officers would be motivated to present false testimony," not as a basis for acquittal in and of itself. *Id.* at 22. The defense was therefore viable.

Salazar filed a petition for leave to appeal (PLA) the appellate court's decision. In that petition, he raised only one of the suppression claims and two of the ineffective assistance of counsel claims. The Illinois Supreme Court denied the PLA.

In March 2011, Salazar filed a *pro se* post-conviction petition in the Circuit Court of Cook County. In that petition, he asserted the following claims: (1) the indictment should have been dismissed because the prosecutor knowingly presented false testimony to the grand jury; (2) trial counsel was ineffective for failing to move to dismiss

---

[1] The appellate court did not directly address the trial court's failure to sever the trials *sua sponte*. The appellate court's conclusion that the defenses were not antagonistic, however, dispenses with this argument as well.

7

the indictment; (3) trial counsel was ineffective for failing to impeach Tomalis's testimony at the suppression hearing with his testimony to the grand jury; (4) appellate counsel was ineffective for failing to raise claims 2 and 3 on direct appeal; (5) appellate counsel was ineffective for failing to argue in the PLA that the police officers lacked probable cause to arrest; and (6) the post-conviction trial judge was biased. The court denied Salazar's petition in an oral ruling.

On appeal of his post-conviction petition, Salazar again raised following claims: (1) the indictment should have been dismissed because the prosecutor knowingly presented false testimony to the grand jury; (2) appellate counsel was ineffective for failing to argue that his trial counsel should have moved to dismiss indictment; (3) appellate counsel was ineffective for failing to argue that trial counsel should have impeached Tomalis at the suppression hearing; and (4) the post-conviction trial judge was biased. Salazar also made several new ineffective assistance of counsel arguments concerning his appellate counsel. The appellate court affirmed the dismissal of Salazar's post-conviction petition. Salazar then filed a PLA, in which he raised the same claims. The Illinois Supreme Court denied the PLA.

**C.     Salazar's habeas corpus petition**

Salazar filed a *pro se* habeas corpus petition in this Court in April 2014. He asserted fifteen claims in his petition. In response, Pfister argued that these claims were not cognizable, procedurally defaulted, or barred by 28 U.S.C. § 2254(d). In his reply brief, Salazar conceded that seven of these claims were either procedurally defaulted or not cognizable. That leaves the following eight claims: (1) because the officers' testimony at the suppression hearing was incredible, there was no probable

cause to justify his arrest and the search of his apartment; (2) the officers' warrantless entry into his apartment was not justified by exigent circumstances; (3) the search of the back bedroom exceeded the bounds of a protective sweep; (4) trial counsel was ineffective for failing to move for severance; (5) trial counsel was ineffective for arguing in closing statement that the jury should acquit because the police lacked probable cause to search his apartment; (6) trial counsel was ineffective for failing to move to dismiss the indictment; (7) trial counsel was ineffective for failing to impeach Officer Tomalis at the suppression hearing with his grand jury testimony; and (8) the indictment should have been dismissed because the prosecutor knowingly presented false testimony to the grand jury. Pfister contends that these claims are not cognizable or are barred by 28 U.S.C. § 2254(d).

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Id.* § 2254(d); *see also Hanson v. Beth*, 738 F.3d 158, 162 (7th Cir. 2013).

**A.  Fourth Amendment claims**

Salazar contends that the arresting officers lacked probable cause to search his

apartment and that as a result, the evidence seized from the apartment should have been suppressed. He argues, in particular, that Officer Tomalis's testimony about witnessing an outdoor drug transaction—the basis for probable cause—was not credible. Additionally, Salazar contends that the officers' warrantless entry into his apartment was not justified by exigent circumstances and that the search of the back bedroom exceeded the bounds of a protective sweep. Thus, he contends, the cocaine was seized in violation of the Fourth Amendment.

The Fourth Amendment includes a prohibition against unreasonable searches and seizures. Under *Stone v. Powell*, 428 U.S. 465 (1976), habeas corpus relief is unavailable on a Fourth Amendment claim when the state has already provided "full and fair litigation" of the claim. *Id.* at 494. This Court's role "is not to second-guess the state court on the merits of the petitioner's claim" but rather to make certain "that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013).

This is a high standard for a habeas corpus petitioner to overcome, and Salazar does not do so here. The trial court's hearing on Salazar's motion to suppress was full and fair. Salazar was permitted to call witnesses—Officers Tomalis and Hackett both testified—and make opening and closing arguments. Moreover, there is no indication that the trial court failed to render an intellectually honest decision. The trial court considered each of Salazar's arguments, cited case law, and supported its reasoning with testimony presented at the suppression hearing. Indeed, although the trial court denied the motion to suppress the cocaine seized by the arresting officers, it granted the motion to suppress the cannabis. On appeal, Salazar again received a full review of

his Fourth Amendment claims. Given these facts, *Stone* precludes the Court from reviewing Salazar's Fourth Amendment claims on their merits.

**B.      False grand jury testimony claim**

Salazar contends that his indictment should have been dismissed because the government knowingly presented false testimony to the grand jury. Specifically, Salazar claims that Officer Tomalis falsely testified that he observed an outdoor drug transaction between Salazar and Seka. He provided this false testimony, Salazar asserts, to create a basis for probable cause.

To prove that Tomalis's testimony was false, Salazar points to three claimed discrepancies between his grand jury testimony and his trial testimony. None are in fact inconsistencies, let alone sufficient to call Tomalis's entire grand jury testimony into question.

First, Salazar notes that Tomalis testified at the grand jury that he saw Salazar exchange cocaine for money but later testified that he only "believed" what he saw was money and could not tell for certain. These statements are not inconsistent. True, Tomalis qualified his later statement, but that does not render the two statements inconsistent. Tomalis did not testify at trial that he lied to the grand jury about observing money, nor did he state that he observed something other than money. Thus, although later testimony arguably casts some doubt on Tomalis's ability to perceive the transaction, it does not prove that he committed perjury.

Second, Salazar notes that Tomalis testified at the grand jury that the cocaine was wrapped in clear plastic but later testified that the packaging was "clearish brownish." These statements are not inconsistent. The later testimony merely adds

11

detail about the coloring of the package. It does not contradict Tomalis's earlier testimony about the transparency of the packaging; indeed, it reaffirms this testimony.

Third, Salazar notes that Tomalis testified at the grand jury that he recovered the package of cocaine from Seka but later testified that Seka had dropped the package of cocaine and that he recovered it from the ground. These statements are not necessarily inconsistent, and even if inconsistent, the inconsistency does not suggest perjury. Because Tomalis last observed the cocaine in Seka's possession, he could truthfully state that he recovered the cocaine from Seka, even if Seka dropped the cocaine during their encounter.

At best, Salazar showed some rather minor inconsistencies in Tomalis's testimony. These inconsistencies are not indicative that Tomalis committed perjury before the grand jury. It was not unreasonable, then, for the post-conviction appellate court to conclude that this claim was "conclusory," "mostly incoherent," and had "no arguable basis in fact." Resp.'s Ex. M at ¶ 16. The Court therefore overrules this claim.

## C.     Ineffective assistance of counsel claim

To establish an ineffective assistance of counsel claim, a petitioner must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is that which falls below "an objective standard of reasonableness," considered "under prevailing professional norms." *Id.* at 688. Courts must be "highly deferential" when scrutinizing counsel's performance, which is subject to a "strong presumption" that it "falls within the wide range of reasonable professional assistance." *Id.* at 689. As for prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Salazar contends that his trial counsel was ineffective for: 1) failing to move to sever Salazar's trial from that of his codefendants, who, Salazar argues, presented defenses antagonistic to his, 2) arguing in closing argument that the jury should acquit Salazar because the police lacked probable cause to search his apartment, 3) failing to move to dismiss the indictment, which, Salazar argues, relied on Tomalis's false testimony, and 4) failing to impeach Tomalis at the suppression hearing with his grand jury testimony. The Illinois Appellate Court rejected the first two of these claims on their merits. Thus, this Court's review is "doubly deferential" as to these claims, owing to the application of both *Strickland*, which requires deference when scrutinizing counsel's performance, and 28 U.S.C. § 2254(d), which requires deference to state court decisions. *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013). In other words, the Court "take[s] a 'highly deferential' look at counsel's performance, through the 'deferential lens of § 2254(d).'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (citations omitted) (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)).

   1.   **Antagonistic defenses claim**

Salazar argues that Seka and Ramirez's defenses were so antagonistic to his own that he could not receive a fair trial. Salazar notes, in particular, that Seka and Ramirez argued that the police officers were looking for Salazar on the night in question but came to the wrong address (that is to say, Seka and Ramirez's apartment, which was Salazar's former address). Accordingly, Salazar contends, his counsel should have

moved for a severance.

In Illinois, the general rule is that defendants who are jointly indicted are to be jointly tried. *People v. Lee*, 87 Ill. 2d 182, 187, 429 N.E.2d 461, 463 (1981). Severance is required, however, when the "defenses are so antagonistic that a severance is imperative to assure a fair trial." *Id.* at 188, 506 N.E.2d at 464. The most common scenario is "when a codefendant takes the stand to point a finger at the defendant as the real perpetrator of the offense." *Id.* at 187, 506 N.E.2d at 463.

The appellate court held that Salazar's defense was not antagonistic to his codefendants' defenses and that as a result, his counsel did not render ineffective assistance in failing to move for a severance. In reaching this decision, the appellate court cited the correct standard for antagonistic defenses and analyzed the ineffective assistance of counsel claim under *Strickland*. The appellate court noted that the defendants assured the trial court before trial that their respective defenses would not be antagonistic. The appellate court observed, in addition, that all of the defendants asserted that the police officers' testimony was fabricated, and none of the attorneys "attacked each other's clients." Resp.'s Ex. A at 19. Although Seka and Ramirez testified that the police officers were looking for Salazar, the appellate court concluded that this testimony was intended to prove that the Officer Tomalis's testimony was fabricated, not to prejudice Salazar. Indeed, in his opening statement, Salazar's attorney himself told jurors that "the evidence will show that . . . six officers specifically went to the location of 5319 South Fairfield, specifically looking for Mr. Salazar." Resp.'s Ex. W at V17. Given these facts, it was not unreasonable for the appellate court to conclude that the defenses were not antagonistic.

### 2. Nonviable defense claim

Salazar contends that his trial counsel argued that the jury should acquit because the police lacked probable cause to search his apartment. Because probable cause is a legal question rather than a question for the jury, Salazar contends, his attorney presented a nonviable defense. Thus, Salazar argues, his attorney's performance fell below an objective standard of reasonableness.

The appellate court considered this argument and ruled that Salazar had mischaracterized the record. As the appellate court observed, Salazar's defense at trial was that the police officers had fabricated their entire testimony in order to establish probable cause to search his apartment. His counsel's discussion of probable cause, then, was not an improper argument to the jury, but an explanation of "why police officers would be motivated to present false testimony." Resp.'s Ex. A at 22. Given these facts, it was not unreasonable for the appellate court to reject Salazar's nonviable defense claim.

### 3. False grand jury testimony claims

Salazar contends that Tomalis gave false testimony to the grand jury. Thus, Salazar argues, his counsel was ineffective for (1) failing to move to dismiss the indictment, and (2) failing to impeach Tomalis at the suppression hearing with his grand jury testimony. As discussed above, however, there would have been no reasonable basis for an argument that Tomalis's grand jury testimony was perjurious. And any inconsistencies between that testimony and his suppression hearing testimony were minor and thus would not have had an impact on the trial judge's credibility determination. Because the underlying arguments lacked merit, Salazar's counsel was

not ineffective for failing to present them. *See Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013) ("Counsel is not ineffective for failing to raise meritless claims."). Salazar's two ineffective assistance claims based on Tomalis's grand jury testimony therefore fail.

**D.     Certificate of appealability**

When a district court enters a final judgment that denies a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA). "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA. *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

The Court's determinations that some of Salazar's claims are barred by *Stone v. Powell* and that others were reasonably adjudicated by the state courts are not fairly debatable. The Court therefore declines to issue a certificate of appealability.

**Conclusion**

For the foregoing reasons, the Court denies Salazar's petition for a writ of habeas corpus and directs the Clerk to enter judgment in favor of the respondent. The Court also declines to issue a certificate of appealability.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 22, 2014